

# IN THE
# TENTH COURT OF APPEALS

### No. 10-16-00348-CR

**LAWSON ABRAM,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 87th District Court
Freestone County, Texas
Trial Court No. 15-067CR**

## MEMORANDUM  OPINION

Appellant Lawson Abram was convicted by a jury of capital murder in the death of Douglas Carr Hurst.  Abram received an automatic life sentence without the possibility of parole after the State elected not to seek the death penalty.  In four issues, Abram challenges his conviction and sentence.  We affirm.

*Background*

Amber Halford,[1] Hurst's niece, and Dustin Sanoja, Hurst's nephew, conspired with Joshua "J.D." Mulkey to burglarize Hurst's residence in Teague, Texas in order to steal firearms and other valuables. Hurst was out of town with a number of family members celebrating his recent marriage. The burglary was discovered on Sunday March 8, 2015 by Hurst's step-daughter, who was checking on the house and feeding the dogs while the family was out of town. The burglars shoved through a set of French doors and kicked in the combination-secured door to the master bedroom where Hurst stored his large gun collection. A number of firearms were stolen, including a Glock .357 caliber handgun with a grip-controlled laser site.

Hurst's step-daughter called to inform him of the burglary. Hurst left Galveston earlier than originally planned in order to secure his house after the break-in. The French doors through which the burglars entered did not lock properly and could be opened with a strong push, even with the deadbolt engaged. After arriving at his residence, Hurst placed a stool with glassware on top in front of the French doors to alert him in the event of another break-in. Some time after 1:00 a.m. on March 9, J.D., accompanied by Abram and Abram's cousin, OJarian McClenon ("O.J."),[2] broke into Hurst's home

---

[1] Halford was convicted of capital murder in a separate trial for her participation in the burglary and subsequent murder and also received a life sentence. *See Halford v. State*, No. 10-16-00358-CR, 2017 WL 4079644 (Tex. App.—Waco Sept. 13, 2017, pet. ref'd).

[2] The record contains a variety of spellings for McClenon's first name. We use the spelling used by McClenon in his unsworn declaration attached to Abram's amended motion for new trial.

McClenon pled guilty to murder for his participation in Hurst's death and was sentenced to forty years in prison.

through the French doors. J.D. and Hurst exchanged gunfire, and both were shot. Abram and O.J. fled. J.D. ran from the residence, collapsing and dying in Hurst's back yard. The .357 Glock stolen in the burglary the night before was beside J.D.'s body. Hurst was able to call 9-1-1, and he was transported by ambulance to a hospital in Waco. Hurst succumbed to his injuries a few days later. During questioning by law enforcement, Abram confessed his participation in the burglary.

### *Issues*

Abram presents the following points of error:

(1)     The trial court abused its discretion in denying Abram's motion to suppress his statements that were made to law enforcement in violation of article 38.22 of the Code of Criminal Procedure and the Fifth Amendment to the United States Constitution and his motion to suppress the evidence seized from his cell phone.

(2)     The evidence is legally and factually insufficient to convict Abram of capital murder.

(3)     The trial judge erred in denying Abram's request for a continuance to allow Dr. Phillip Taft to testify; and in denying Abram's motion for a new trial to allow O.J. to testify on Abram's behalf in violation of Abram's Sixth Amendment right to call witnesses and to rebut evidence presented by the prosecution.

(4)     Section 19.03 of the Penal Code, which allows the imposition of life without the possibility of parole, is unconstitutional as it precluded Abram from presenting mitigating evidence in violation of Abram's right to due process and right to not be subjected to cruel and unusual punishment under both the U.S. and Texas Constitutions.

### *Discussion*

A. Motions to Suppress. In his first issue, Abram argues that the trial court erred in denying his motions to suppress. Abram asserts that the oral statement he gave to law

enforcement, in which he confessed to his role in the offense, and the evidence seized from his cell phone should be suppressed because: (1) Abram was in custody for purposes of article 38.22; (2) the *Miranda* warning given was ineffective because it occurred in the middle of Abram's questioning and was without curative measures; (3) Abram's confession was not voluntary because it was the result of coercive and deceptive actions and improper inducements; (4) Abram did not expressly waive his rights under *Miranda* or 38.22; and (5) Abram's cell phone was searched without a warrant or his consent.

1. Standard of Review. We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor; and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact

questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions *de novo*. *Amador*, 221 S.W.3d at 673; *Johnson*, 68 S.W.3d at 652–53.

2. Findings of Fact and Conclusions of Law. After an evidentiary hearing on Abram's motion to suppress his oral statements, the trial court made the following findings of fact and conclusions of law:

1. On March 9, 2015, Freestone County Sheriff's Deputy Clayton Aldrich, while investigating a shooting that left one person dead (J.D. Mulkey), and the other in critical condition (Doug Hurst), was advised by witnesses that Defendant had been with J.D. Mulkey the evening before the shooting.

2. That Deputy Aldridge [sic] went to the home of Defendant to see if he would be willing to give a statement. That Defendant agreed to go with Deputy Aldridge [sic]. That Defendant was not placed under arrest or restrained by Deputy Aldrich. Defendant voluntarily left his home and entered Deputy Aldrich's vehicle and went to the Teague Municipal building. Defendant voluntarily went into said building with Deputy Aldrich.

3. Defendant was interviewed by Texas Ranger Patrick Pena in a room at said building. At the time of the interview the Defendant was not handcuffed or restrained in any way. Defendant was not told he could leave and likewise was not told he had to remain. Defendant voluntarily agreed to give Patrick Pena a statement. Initially, the Defendant received no Miranda admonishments or admonishments set out in Article 38.22 Section 2 of the Texas Code of Criminal Procedure. However, this Court concludes that at the time of the initial interview the Defendant was not the subject of custodial interrogation in that he had not been arrested or detained and Ranger Pena had no information that caused him to focus on Lawson Abram as a Defendant instead of an informational witness.

4. During the interview Ranger Pena told Defendant that Defendant was not being truthful, and Defendant changed portions of his statement that implicated Defendant in the homicide of Doug Hurst. Defendant had a cell phone and was never advised that he could not use it. Defendant was never restrained while he was giving the statement.

5. At the time that Defendant began to implicate himself, Ranger Pena gave Defendant the statutory admonishments required by Section 2, Article 38.22 of the Texas Code of Criminal Procedure. After that Defendant continued to give a statement and never requested an attorney or asked to end the interview.

6. This Court concludes that the statement of Lawson Lee Abram was voluntarily given and is admissible into evidence.

After a hearing on Abram's motion to suppress evidence seized from his cell phone, the trial court made the following ruling:

Based on the evidence heard and considered by the Court, I find by clear and convincing evidence that access to Lawson Abram's cell phone, [sic] information was voluntarily provided to the officers; specifically that Patrick Pena, while conversing with the defendant, Lawson Abrams [sic], in an interview at the Teague Police Department while Lawson Abram was not under arrest, provided to Mr. Pena access to the phone and the password to the phone for his being able to access it; that the defendant at that time was free to leave and not in handcuffs or under arrest; that later, after the defendant had been arrested, Clayton Aldrich approached the defendant and asked for permission to look at the phone. Again, Lawson Abrams [sic] provided permission, including the password, and signed a Consent to Search Authorization, which has been introduced in this hearing as State's Exhibit 1.

Court finds the defendant was not represented by counsel at that time but was under arrest when he consented to the use of the phone. Therefore, I conclude the cell phone evidence was knowingly and voluntarily provided by Lawson Abrams [sic] to the peace officers. Therefore, your motion is respectfully denied.

3. Interview or Custodial Interrogation. Whether an individual is "in custody" depends upon a review of the totality of the circumstances, and "the initial step is to ascertain whether in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Howes v. Fields*, 565 U.S. 499, 509, 132 S.Ct. 1181, 1189, 182

L.Ed.2d 17 (2012) (citations omitted); *see also Estrada v. State*, 313 S.W.3d 274, 294 (Tex. Crim. App. 2010) ("[T]he ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest"); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) ("A person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest"). The second part of the inquiry focuses upon "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509, 132 S.Ct. at 1190.

The Court of Criminal Appeals has identified four general situations that may constitute custody:

> (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

*Dowthitt*, 931 S.W.2d at 255; *see also Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009).

Testifying at the suppression hearing were Clayton Aldrich, a deputy investigator for the Freestone County Sheriff's Office, Robert Patrick Pena, a Texas Ranger, and Abram. Aldrich testified that the initial investigation of Hurst's murder revealed the names of a number of individuals who may have been involved or had information about the case, including Abram. Aldrich was dispatched to Abram's residence to request that

Abram come to the police station for an interview. Aldrich was accompanied by the Teague Chief of Police. Abram was asleep when the officers knocked on his front door. Aldrich told Abram that he was a person of interest in the burglary and asked if he would come to the police station to be interviewed. Abram testified that one of the officers told him that he had to go with them. Abram was driven to the police station in Aldrich's patrol vehicle. Abram was not arrested, searched, or handcuffed for the ride to the station nor inside the station. Abram did not remember if the officers were in uniform, if they were armed, or if they displayed their badges. One of the officers placed his hand on Abram's arm to direct him into the station, but removed his hand when they were inside the station. The police station was located in the municipal building, and Abram was escorted into a conference room that was usually used by the city council. There were no windows in the room, and there was only one door.

Pena conducted Abram's interview. At certain points during the interview, Pena left the room to confer with officers interviewing others who had been brought in for questioning. Pena did not tell Abram he could not leave the conference room, although Pena would say things like, "Hang on. I'll be right back" or "Stay here for a second." The door to the conference room was shut during the interview, and Pena would close it when he left the room. The door was never locked, although Pena did not specifically tell Abram this. Abram had his cell phone in his possession during the interview and was not prevented from using it. Pena initially had no information regarding Abram's involvement in Hurst's murder other than that Abram's name was mentioned during interviews of other individuals, and he had no probable cause to arrest Abram before the

interview started. Abram was free to leave at any time, although Pena did not tell Abram he was free to leave. After the interview was concluded, Abram left without being placed under arrest.

The trial court credited the testimony of Aldrich that Abram voluntarily accompanied him for questioning. The testimony of Aldrich, Pena and Abram supports the trial court's determination that Abram was never handcuffed nor otherwise restrained, Abram was not told he was not free to leave or that he had to remain for questioning, and Pena had no probable cause to believe Abram had committed a crime.[3] Considering the trial court's findings and the record, a reasonable person would not have believed that his or her freedom of movement was significantly restricted to the degree that constituted an arrest.

Viewing the evidence in the light most favorable to the trial court's ruling, the trial court did not err in determining that Abram was not in custody during his questioning by Pena and that Pena was not required to inform Abram of his rights under *Miranda* or article 38.22. *See Martinez v. State*, 496 S.W.3d 215, 219 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

4. Mid-Stream Warning. Abram argues that a "midstream" *Miranda* warning is generally not permissible, citing *Ervin*, 333 S.W.3d at 212-13. However, in a situation where a "midstream" *Miranda* warning is given, a post-warning statement is

---

[3] Even if Abram's admission that he was present during the burglary gave Pena probable cause for an arrest, Pena did nothing to manifest to Abram that he believed there was probable cause to arrest him. *See Ervin v. State*, 333 S.W.3d 187, 211 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

subject to suppression only if the questioning officer used a "two-step, 'question first, warn later' strategy." *Carter v. State*, 309 S.W.3d 31, 36 (Tex. Crim. App. 2010).

Where the two-step tactic is not deliberately employed, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Oregon v. Elstad*, 470 U.S. 298, 318, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222 (1985); *Carter*, 309 S.W.3d at 36. "In this situation, where the first statement is unwarned but not coerced, 'the admissibility of any subsequent statement should turn . . . solely on whether it is knowing and voluntarily made.'" *Ervin*, 333 S.W.3d at 213 (quoting *Elstad*, 470 U.S. at 309, 105 S.Ct. at 1293).

There was no evidence presented at the suppression hearing that indicated any deliberate effort to undermine *Miranda*.

5. Voluntariness. Abram argues that his confession was not voluntary because Pena used deceit and trickery as well as coercion and overreaching to obtain his statements. Specifically, Abram notes that Pena promised that Abram would not be prosecuted for capital murder if he provided statements implicating himself.

The audio recording of Abram's interrogation reflects that Pena made statements such as Abram was looking at capital murder, aggravated assault or burglary depending on the circumstances and should provide a truthful accounting of his actions in order to help himself out. Pena also told Abram that Amber and O.J. were providing full statements regarding everyone's involvement in the burglary and were looking at relative slaps on the wrist.

Under Article 38.21, "A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion,. . . ." TEX. CODE CRIM. PROC. ANN. art. 38.21.

> A defendant may claim that his statement was not freely and voluntarily made and thus may not be used as evidence against him under several different theories: (1) Article 38.22, § 6—general voluntariness; (2) *Miranda v. Arizona* as expanded in Article 38.22, §§ 2 and 3 (the Texas confession statute); or (3) the Due Process Clause. It may be involuntary under one, two, or all three theories. A statement that is "involuntary" as a matter of constitutional law is also "involuntary" under Article 38.22. . . .

*Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008) (footnotes omitted). Under the second and third theories, a confession is involuntary "only when there is police overreaching." *Id.*

> Absent police misconduct causally related to the confession, there is no deprivation of due process of law by a state actor and therefore no violation of the Due Process Clause. Likewise, *Miranda* protects against government coercion to surrender Fifth Amendment rights. Thus, due process claims and *Miranda* claims of involuntariness involve an objective assessment of police behavior.

*Cervantes-Guervara v. State*, 532 S.W.3d 827, 833 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (internal citations omitted). Trickery or deception does not make a statement involuntary unless the method was calculated to produce an untruthful confession or was offensive to due process. *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997).

Under the Court of Criminal Appeals' precedents, section 6 of article 38.22 applies to both an accused's custodial and non-custodial statements. *Oursbourn*, 259 S.W.3d at 171. Claims of involuntariness under article 38.22, section 6 can be, but need not be, predicated on police overreaching of the sort required under a due-process analysis. *Id.*

at 172. Under articles 38.21 and 38.22, section 6, we may consider, in addition to any allegedly coercive police conduct, factors such as the suspect's youth, intoxication, mental retardation, or other disability that would not raise a federal due-process claim. *Id.* at 172–73. Under articles 38.21 and 38.22, fact scenarios that can raise a state-law claim of involuntariness include the following:

> (1) the suspect was ill and on medication and that fact may have rendered his confession involuntary; (2) the suspect was mentally retarded and may not have "knowingly, intelligently and voluntarily" waived his rights; (3) the suspect "lacked the mental capacity to understand his rights"; (4) the suspect was intoxicated, and he "did not know what he was signing and thought it was an accident report"; (5) the suspect was confronted by the brother-in-law of his murder victim and beaten; (6) the suspect was returned to the store he broke into "for questioning by several persons armed 'with six-shooters.' "

*Id.* (footnotes omitted). "'Voluntariness' under both constitutional and state law doctrines is to be measured according to the totality of the circumstances." *Smith v. State*, 779 S.W.2d 417, 427 (Tex. Crim. App. 1989).

In his brief, Abram notes that at the time of his confession he was eighteen years old, under the influence of illegal substances, suffered from "adult anti-social behavior," "cannabis use disorder," "attention deficit hyperactivity disorder," and "combined presentation adjustment disorder with anxiety." The only one of the foregoing that appears in the record before the trial court at the hearing on the motion to suppress is that Abram was eighteen at the time of his confession.

Abram also offered no evidence to indicate that the "deception" used by Pena caused Abram's will to be "overborne." Indeed, Abram presented nothing at the suppression hearing that would support any allegation that Pena lied to him about the

admissions that O.J. and Amber were making during their questioning by the police. Finally, there was nothing to support a claim that any police prevarication was calculated to produce an untruthful confession.

Abram also asserts that Pena made false promises that he would face lesser charges if he confessed. Law enforcement may not elicit confessions by making false promises. *Mason v. State*, 116 S.W.3d 248, 260 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (citing *Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963)) (holding defendant's will was overborn by police promise not to take away children if defendant confessed); *see also Gipson v. State*, 844 S.W.2d 738, 739-40 (Tex. Crim. App. 1992) (affirming decision holding improper an officer's implied inducement to defendant that his confession might be used for him or on his behalf).

> A statement is involuntary, and thus inadmissible, if it is induced by a promise that is (1) of some benefit to the defendant; (2) positive; (3) made or sanctioned by someone in authority; and (4) of such a character as would likely influence the defendant to speak untruthfully.

*Mason*, 116 S.W.3d at 260 (citing *Sossamon v. State*, 816 S.W.2d 340, 345 (Tex. Crim. App. 1991)); *see also Bordman v. State*, 56 S.W.3d 63, 69 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (defendant's confession was admissible despite church elder's statement during interrogation that if defendant confessed, he would "probably" just get "five years instead of fifteen").

Pena's statements to Abram were not so manipulative or coercive that they deprived Abram of his ability to make an unconstrained, autonomous decision to confess. While Pena did tell Abram that he could be looking at a variety of charges, that was not

untrue.  Abram was initially arrested for aggravated assault rather than capital murder.  The capital murder charges were not brought against him until after Hurst died.  Further, Pena's statements to Abram did not constitute a promise of favorable treatment if he confessed.

Abram also offers no evidence to suggest that Pena's statements about what might happen if Abram told the truth were anything more than mere predictions about future events.  A "prediction about future events" is not the same as a "promise."  *Mason*, 116 S.W.3d at 260-61 (quoting *United States v. Fraction*, 795 F.2d 12, 15 (3rd Cir.1986) (reasoning that a "prediction" is an action beyond a party's control, while a "promise" is an offer to perform or withhold action within a party's control)); *see also Espinosa v. State*, 899 S.W.2d 359, 362–63 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd) (finding the mere fact that the officer told the defendant, "Go ahead and tell us what happened.  Everything will be better for you.  You will get less time" did not render the defendant's statement involuntary).

Finally, Pena did not imply that it was in his control to determine how Abram's statements would benefit Abram; he merely implied that it was in Abram's control to help himself by admitting his role in the burglary of Hurst's house.  Abram offers no evidence to suggest that his will was overborne by Pena's comments.  A confession is involuntary if "it [is] obtained as the result of [the] promise."  *Mason*, 116 S.W.3d at 261 (quoting *Fraction*, 795 F.2d at 14).

Viewing the evidence in the light most favorable to the trial court's ruling, we conclude that, based on the totality of the circumstances, the trial court did not abuse its

discretion in concluding that Abram's statement was voluntary under *Miranda*, the Due Process Clause, and Art. 38.21.

6. Waiver of Rights. Abram further asserts that his statement should have been suppressed under article 38.22 because he did not expressly waive his rights. Under article 38.22, no oral statement of an accused made as a result of interrogation shall be admissible against the accused in a criminal proceeding unless (1) the statement was recorded, and (2) prior to the statement being made but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3(a); *Joseph v. State*, 309 S.W.3d 20, 23-24 (Tex. Crim. App. 2010). The State bears the burden of establishing a knowing, intelligent, and voluntary waiver of rights under *Miranda* and Article 38.22. *Leza v. State*, 351 S.W.3d 344, 349, 351 (Tex. Crim. App. 2011); *Joseph*, 309 S.W.3d at 24. Waiver must be proven by a preponderance of the evidence. *Leza*, 351 S.W.3d at 349, 351. Without a valid waiver, a defendant's statement is generally inadmissible. *Joseph*, 309 S.W.3d at 24. In determining whether there was a valid waiver of an accused's rights, the court looks to the totality of the circumstances, "including the background, experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374-75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979); *Leza*, 351 S.W.3d at 349, 352-53; *Joseph*, 309 S.W.3d at 25.

A waiver may be expressly made or implied by the accused's conduct. *Joseph*, 309 S.W.3d at 24. An implied waiver of one's rights is established upon a showing that the accused: (1) was given the proper warnings; (2) understood the warnings and their consequences; and (3) made an uncoerced statement. *Berghuis v. Thompkins*, 560 U.S. 370,

384, 130 S.Ct. 2250, 2261, 176 L.Ed.2d 1098 (2010); *Leza*, 351 S.W.3d at 349. While waiver may not be presumed from an accused's silence or the fact that a confession was made after warnings were provided, "the general rule is that neither a written nor an oral express waiver is required." *Watson v. State*, 762 S.W.2d 591, 601 (Tex. Crim. App. 1988). Continuing to answer police questions after indicating that the accused understands his *Miranda* rights is often the kind of conduct viewed as indicative of one's intention to waive his rights. *Leza*, 351 S.W.3d at 354 n.33; *Joseph*, 309 S.W.3d at 25 n.7.

After Pena advised Abram of his rights, Abram said that he understood them. Abram continued to answer Pena's questions afterwards, impliedly waiving his rights. There was nothing to indicate during Pena's questioning that Abram was on drugs or any other substances or that Abram suffered from any mental defect that would affect Abram's understanding of his rights and the consequences of waiving them. Abram also noted during his questioning that he had been in legal trouble before after being arrested for a burglary three years previously. Abram was, therefore, already familiar with the legal system.

Viewing the totality of the circumstances in the light most favorable to the trial court's findings, we conclude that the trial court's determination that Abram waived his rights pursuant to *Miranda* and article 38.22 was not erroneous.

7. Cell Phone Access. A review of Abram's recorded confession reveals that he voluntarily consented to a search of his cell phone during his interrogation, even signing a written consent form. Abram provided Pena with his password. Therefore, the

trial court did not abuse its discretion in denying Abram's motion to suppress the evidence obtained from his cell phone.

The record supports the trial court's determination that Abram's confession was knowingly and voluntarily made and that Abram voluntarily consented to a search of his cell phone. We overrule Abram's first issue.

B. Sufficiency of the Evidence. In his second issue, Abram asserts that the evidence is legally and factually insufficient[4] to support his conviction for capital murder. Abram specifically contends that the State provided no evidence that either he or J.D. intended to cause Hurst's death. The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). This standard requires the appellate court to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. We may not re-weigh the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The court conducting a sufficiency review must not engage in a "divide and conquer" strategy but must consider the cumulative force of all the evidence. *Villa*, 514 S.W.3d at 232. Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016) (*citing Jackson*, 443 U.S. at 319); *see also Hooper v. State*, 214

---

[4] The Court of Criminal Appeals has eliminated the separate standards of legal and factual sufficiency. *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010). The Court of Criminal Appeals, as well as this Court, has previously rejected requests to reinstate factual sufficiency review. *See Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010); *see also Steggall v. State*, No. 10-17-00017-CR, 2018 WL 3763747, at *1 (Tex. App.—Waco Aug. 8, 2018, pet. ref'd) (mem. op., not designated for publication).

S.W.3d 9, 16-17 (Tex. Crim. App. 2007). We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). This is because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13.

We measure whether the evidence presented at trial was sufficient to support a conviction by comparing it to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*; *see also Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013). The "law as authorized by the indictment" includes the statutory elements of the offense and those elements as modified by the indictment. *Daugherty*, 387 S.W.3d at 665.

*Zuniga v. State*, 551 S.W.3d 729, 732-33 (Tex. Crim. App. 2018).

By a general verdict, Abram was found guilty of capital murder. The trial court's jury charge allowed the jury to find Abram guilty individually, as a party, or as a co-conspirator, pursuant to sections 7.01, 7.02(a)(2), and 7.02(b) of the Texas Penal Code. Where, as here, the jury charge authorizes conviction on multiple theories, we must uphold the jury's verdict if the evidence is sufficient under any of the multiple theories. *Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007); *Green v. State*, 495 S.W.3d 563, 572 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd).

To convict Abram for capital murder as a conspirator, the State was required to prove beyond a reasonable doubt the following: (1) Abram was a party to a conspiracy to commit burglary of a habitation; (2) one of Abram's co-conspirators intentionally caused Hurst's death in the attempt to commit burglary of a habitation; (3) the murder was committed in furtherance of the conspiracy to commit burglary of a habitation; and (4) Abram should have anticipated Hurst's murder could result from carrying out the burglary of a habitation. *Green*, 495 S.W.3d at 572-73.

Abram's confession is sufficient to prove the elements required. Abram told Pena that he agreed to assist J.D. and O.J. in burglarizing Hurst's house, that all three men went inside Hurst's house to commit the burglary, and that J.D. shot Hurst after they entered the house. Abram's main argument is that there was no intent to commit murder.

Direct evidence of intent is rarely available and is more often proven through the use of circumstantial evidence. *See Hamilton v. State*, 399 S.W.3d 673, 680 (Tex. App.—Amarillo 2013, pet. ref'd). Circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). In determining the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

The intent to kill may be inferred from the use of a deadly weapon. *Dominguez v. State*, 125 S.W.3d 755, 761 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). A firearm is

a deadly weapon *per se*.  *Dukes v. State*, 486 S.W.3d 170, 177 (Tex. App.—Houston [1st Dist.] 2016, no pet.).  When a defendant fires a deadly weapon at close range and death results, the law presumes an intent to kill.  *Sholars v. State*, 312 S.W.3d 694, 703 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd); *Child v. State*, 21 S.W.3d 631, 635 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).  *See also Balderas v. State*, 517 S.W.3d 756, 766-67 (Tex. Crim. App. 2016) ("act of pointing loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill").

There was sufficient evidence from which the jury could infer that J.D. intended to kill Hurst when J.D. unlawfully entered Hurst's house and shot the Glock in Hurst's direction.  Abram's argument that the evidence is unclear whether Hurst or J.D. shot first does not negate the jury's finding.  As Abram himself noted during his questioning by Pena, Hurst had the right to defend himself and his property from their unlawful entry into his home.  Even if Hurst fired his weapon first, J.D. would still possess the requisite intent to kill.  *See Rousseau v. State*, 855 S.W.2d 666, 674-75 (Tex. Crim. App. 1993) (testimony that offender did not fire first shot does not amount to evidence that offender had not formulated intent to cause victim's death in returning fire).

The question then becomes whether Abram should have anticipated that Hurst's murder could result from carrying out the burglary.  Evidence that a defendant knew that a co-conspirator might use a gun during the course of the conspiracy can be sufficient to demonstrate that the defendant should have anticipated the possibility of murder occurring during the course of the conspiracy.  *See Johnson v. State*, 421 S.W.3d 893, 899 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Davis v. State*, 276 S.W.3d 491, 495 (Tex.

App.—Waco 2008, pet. ref'd); *Love v. State*, 199 S.W.3d 447, 453 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

The record reflects that Abram knew that J.D. was carrying the gun stolen in the previous night's burglary before they went to Hurst's house. Abram attempted to minimize his role by telling Pena that he only agreed to act as a lookout. By agreeing to act as a lookout, Abram knew that there was a possibility someone might see and interrupt them during the course of the burglary. Abram realized there was an even greater possibility of detection when he noticed that a nearby residence had its lights on. Abram saw J.D. pull the gun prior to his entry into Hurst's house, indicating J.D.'s belief that there might be someone in the house. J.D. continued into Hurst's residence after knocking over the stool that was placed in front of the French doors and causing the glassware on top to crash to the ground. Abram followed J.D. into the house even though he believed that the stool was set up to warn someone in the house that another break-in was occurring. Abram advanced behind J.D. further into the house even after hearing a voice from inside yell, "Gotcha!" J.D. began firing his weapon after hearing the voice rather than retreating. Abram did not retreat until after the gunfire began. There was more than sufficient evidence presented from which the jury could have determined beyond a reasonable doubt that Abram anticipated that a murder could result from carrying out the burglary of Hurst's house.

Abram additionally argues that there was insufficient evidence for the jury to conclude that J.D. shot Hurst. Abram's apparent theory is that Hurst shot himself, pointing to bullet trajectories, the failure of the State to match the bullet that killed Hurst

with the .357 Glock found by J.D.'s body, and Hurst's 9-1-1 call. All of the factors raised by Abram were within the province of the jury to evaluate. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). The jury is the sole judge of the weight and credibility of the evidence. *Id.* "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Id.* "We may not re-weigh the evidence or substitute our judgment for that of the factfinder." *Zuniga*, 551 S.W.3d at 732.

There was no evidence of any shooters other than J.D. and Hurst. The investigating officers testified that the trajectories of the bullet holes found in the house were consistent with the shooters firing erratically after the first shots. The bullet casings found in the house matched the weapons used—the .357 Glock wielded by J.D. and a .40 caliber Smith & Wesson used by Hurst. The ammunition used was consistent with the ammunition found with Hurst's gun collection. Although the slug removed from Hurst was not specifically matched to the .357, the firearm examiner testified that older Glock weapons did not mark bullets well. The examiner further testified, however, that the .357 shell casings and the bullet recovered from Hurst were consistent with being fired from a Glock. Finally, the 9-1-1 call from Hurst is not as distinct as Abram would suggest. Abram argues that Hurst told the 9-1-1 operator that he shot himself. However, Hurst told his son, who came to the scene before Hurst was taken to the hospital, that someone had shot him and that he had heard multiple voices in the house. From the forgoing, the jury could infer that J.D. shot Hurst.

Viewing the evidence in the light most favorable to the verdict, we conclude that the jury had sufficient evidence from which to conclude beyond a reasonable doubt that Abram was guilty of capital murder. Abram's second issue is overruled.

C.  Witnesses.  In his third issue, Abram asserts that the trial court erred in not granting a continuance in order to allow him to present the testimony of Dr. Phillip Taft at trial. Abram also contends that the trial court erred in not granting his motion for new trial to enable O.J. to testify on his behalf.

1.  Dr. Taft.  Dr. Taft was retained by Abram for evaluation and to present evidence regarding mitigating factors. Abram moved for a continuance of the trial date because Dr. Taft was out of town, which the trial court denied.

The denial of a motion for continuance is within the sound discretion of the trial court, and we review a trial court's denial of a motion for continuance for an abuse of discretion. *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006); *see also Gutierrez v. State*, 446 S.W.3d 36, 38 (Tex. App.—Waco 2014, pet. ref'd). "[G]reat deference must be shown to trial courts, because of the scheduling problems they face." *United States v. Cronic*, 466 U.S. 648, 662 n. 31, 104 S.Ct. 2039, 2048 n. 31, 80 L.Ed.2d 657 (1984); *see also Cates v. State*, 72 S.W.3d 681, 692 (Tex. App.—Tyler 2001, no pet.). An appellant claiming the erroneous denial of a motion for continuance must show: (1) the trial court erred in denying the motion for continuance; and (2) such denial harmed him in some tangible way. *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010).

A motion for continuance based upon the unavailability of a witness is governed by statute and must include the diligence used to secure the witness's presence at trial.

*Id.*; *see also* TEX. CODE CRIM. PROC. art. 29.06(2) (a first motion for continuance requesting delay "on account of the absence of a witness" must "state" "[t]he diligence which has been used to procure his attendance") and art. 29.07 (subsequent motions for continuance must comply with art. 29.06 and also state that the "testimony cannot be procured from any other source known to the defendant" and that the defendant has a "reasonable expectation of procuring the same at the next term of the court").

The trial court did not abuse its discretion in denying Abram's motion for continuance because Dr. Taft's testimony would not have been admissible during the guilt/innocence phase of the trial. Dr. Taft's report was based only on factors that would mitigate Abram's punishment, not his guilt or innocence. *See Cormier v. State*, 540 S.W.3d 185, 193 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *Lopez v. State*, 493 S.W.3d 126, 139 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd)) (defendant not guaranteed mitigation hearing when facing automatic sentence of life without parole).

2. OJarian McClenon. Abram filed a motion for new trial based upon exculpatory testimony that would have been offered by O.J. had O.J. testified at his trial. Abram subpoenaed O.J. to testify at trial, but O.J.'s attorney asserted O.J.'s Fifth Amendment right not to testify. Abram asserts that made O.J. unavailable as a witness at his trial. O.J. had not entered a plea of guilty to his involvement in Hurst's murder at the time of Abram's trial.

At the hearing on Abram's motion for new trial, O.J. testified that he had been willing to testify on Abram's behalf even before he entered a guilty plea, but that his lawyer "pled the Fifth" for him without his knowledge or consent. O.J. further testified

that he never told his lawyer or Abram's lawyer that he wanted to testify for Abram. On redirect, O.J. testified conversely that his lawyer told him that he did not want him to testify on behalf of Abram.

O.J. stated that he would have testified that he was with Abram and J.D. at Doug Hurst's house but that he did not witness the events that led to the death of J.D. and that he did not really witness the events that led to the death of Hurst. O.J. further testified that he knew J.D. had a gun when they went to Hurst's house, although he denied that there were any discussions regarding a burglary prior to going.

Attached to Abram's amended motion for new trial is an unsworn declaration from O.J. Although offered by Abram as an exhibit at the hearing on the motion for new trial, the trial court sustained the State's objection to the unsworn declaration. When ruling on Abram's motion, the trial court noted that the entire record had been considered, so it is unclear whether O.J.'s declaration was taken into account. In the declaration, O.J. stated the following:

> The night of March 8, 2015 I got a call from Lawson Abram asking me did I want to smoke, I said yea come get me. So when he came to get me we went to Lawson's girlfriends house, where we were smoking and playing the game. A little while later Lawson's Girlfriend Mom asked her to find some bars. They call around and J.D. says he knows where to get some at. So J.D. shows up with the bars, and I buy 2 and Lawson gets 1. After Lawson's girlfriend's Mom takes 1 she ask for some more so we catch J.D. before he leaves. But this time his ride leaves him out there. J.D. walks out the house for like 10 min and comes back in. He doesn't say anything he just turns around and starts walking out. So Lawson got up and walks out they get to the front door and I got up. So as we start walking we come up on a fence we jump the fence and keep walking. J.D. gets to the door and opens it, and all you can hear is somebody yell "What are you Doing in My House." and a gunshot rings out and me and Lawson turn around and run. back to his girlfriend house. Bars are pills that altar your train of thought.

When I took the bars its like I wasn't myself. I couldn't think about anything its like your out of your body. I didn't know where J.D. was leading us or his intentions. When we approached the house neither me nor Lawson entered the house. I was subpoena to testify at Lawson's Trial, but the day of the trial Chad Morgan my attorney said I couldn't go to the court. One of the guards told me thats what he said. I wanted to testify and still do want to testify on behalf of Lawson. I was told that to make the plea I would have to testify against Lawson so I turned down the first plea. The reason I took the plea for 40 years is my lawyers told me it's either 40 or life without parole. My lawyer said he could almost guarantee life without parole so I plead out as a last restort.

O.J.'s lawyer, Chad Morgan, testified that, prior to Abram's trial, he discussed with O.J. the pros and cons of testifying. Morgan further testified that he spoke with O.J., on the phone and in person, after the subpoena was delivered for Abram's trial. Morgan advised O.J. that it was not in his benefit to be on record prior to his own trial. Morgan told O.J. that he wanted to plead the Fifth on his behalf, and O.J. told him "Okay." Morgan further testified that O.J. rejected the State's first plea offer not because he refused to testify against Abram but because he did not want to do time.

Motions for new trial on grounds of newly discovered evidence are not favored and are viewed with great caution. *Drew v. State*, 743 S.W.2d 207, 225 (Tex. Crim. App. 1987); *Lewis v. State*, 126 S.W.3d 572, 579 (Tex. App.—Texarkana 2004, pet. ref'd). We review a trial judge's denial of a motion for new trial under an abuse of discretion standard. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014); *Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001). "We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). "A trial judge abuses his discretion in denying a motion for new trial when no reasonable view of the

record could support his ruling." *Colyer*, 428 S.W.3d at 122; *Holden*, 201 S.W.3d at 763. "We view the evidence in the light most favorable to the trial judge's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party." *Colyer*, 428 S.W.3d at 122. At a motion for new trial hearing, the judge alone determines the credibility of the witnesses. *Id.*; *Salazar*, 38 S.W.3d at 148. "Even if the testimony is not controverted or subject to cross-examination, the trial judge has discretion to disbelieve that testimony." *Colyer*, 428 S.W.3d at 122.

Motions for new trial based upon newly discovered evidence are controlled by Article 40.001 of the Code of Criminal Procedure, which provides, "A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." TEX. CODE CRIM. PROC. ANN. art. 40.001. In order to obtain relief under art. 40.001, the defendant must establish the following:

(1) the newly discovered evidence was unknown or unavailable to the defendant at the time of his trial;

(2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence;

(3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and

(4) the new evidence is probably true and will probably bring about a different result in a new trial.

*State v. Arizmendi*, 519 S.W.3d 143, 149 (Tex. Crim. App. 2017); *see also Keeter v. State*, 74 S.W.3d 31, 36-7 (Tex. Crim. App. 2002).

Viewing the evidence in the light most favorable to the trial court's ruling, the trial court could reasonably have concluded that the evidence O.J. would have offered was

probably not true and would probably not bring about a different result in a new trial. O.J.'s statements regarding drug usage by him and Abram were not corroborated by Abram during Abram's recorded confession or during Abram's testimony at the suppression hearing. Additionally, many of O.J.'s statements directly contradict Abram's recorded confession, particularly in regard to Abram's admissions that all three of the participants, Abram, O.J. and J.D., agreed to burglarize Hurst's home and that Abram and O.J. actually entered the house behind J.D. Further, O.J.'s declaration and testimony that he and Abram followed J.D. to Hurst's house without any discussion is clearly not credible. The trial court could also have determined that Morgan's testimony was more credible than O.J.'s in regard to O.J.'s willingness to "take the Fifth" at Abram's trial and O.J.'s unwillingness to accept a plea due to the time he would have to serve rather than his reluctance to testify against Abram.

We conclude that the trial court did not abuse its discretion in denying Abram's motion for new trial.

As the trial court did not abuse its discretion in denying the motion for continuance or the motion for new trial, we overrule Abram's third issue.

D.  Constitutionality of Capital Murder Statutes.  Abram contends in his fourth issue that Texas Penal Code 19.03 is unconstitutional because a defendant convicted of capital murder when the prosecution does not seek the death penalty is precluded from offering evidence of mitigation at the punishment phase. Although Abram does not specify which sections of the United States Constitution are violated in his appellate brief, the motion to dismiss filed in the trial court asserts that the sentencing scheme violates

Abram's rights to due process and to be free from cruel and unusual punishment under both the U.S. Constitution and the Texas Constitution. Abram's arguments have been rejected by the courts. *See Harmelin v. Michigan*, 501 U.S. 957, 994-96, 111 S.Ct. 2680, 2701-702, 115 L.Ed.2d 836 (1991) (mandatory life sentence does not violate Eighth Amendment); *see also Cormier*, 540 S.W.3d at 192 (mandatory life sentence not in violation of prohibition against cruel and unusual punishment in U.S. or Texas Constitution); *Lewis v. State*, 448 S.W.3d 138, 147 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd), *cert. denied*, --- U.S. ---, 136 S.Ct. 52 (2015) (mandatory sentence for capital murder does not violate right to due process or prohibition of cruel and unusual punishment under U.S. or Texas Constitution); *Simms v. State*, No. 06-18-00181-CR, 2019 WL 2479845, at *11 (Tex. App.—Texarkana June 14, 2019, pet. ref'd) (mem. op., not designated for publication);[5] *Speers v. State*, No. 05-14-00179-CR, 2016 WL 929223, at *5-7 (Tex. App.—Dallas Mar. 10, 2016, no pet.) (mem. op., not designated for publication) (mandatory sentence for capital murder does not violate right to due process or prohibition against cruel and unusual punishment in U.S. or Texas Constitution); *Anderson v. State*, No. 13-07-00752-CR, 2009 WL 2915011, at *4-5 (Tex. App.—Corpus Christi Aug. 27, 2009, pet. ref'd) (mem. op., not designated for publication) (mandatory sentence for capital murder does not violate right to due process or prohibition against cruel and unusual punishment under U.S. or Texas Constitution). Abram's fourth issue is overruled.

---

[5] Under Rule 47.7(a) of the Rules of Appellate Procedure, unpublished memorandum opinions not designated for publication have no precedential value but may be cited with the notation, "(not designated for publication)." Unpublished memorandum opinions are persuasive rather than binding precedent that the court may follow or reject. *See Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

*Conclusion*

Having overruled all of the issues raised by Abram, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Neill
Affirmed
Opinion delivered and filed December 4, 2019
Do not publish
[CRPM]

